FILED

2020 FEB 25  A 9: 31

U.S. DISTRICT COURT
EASTERN DIST. TENN.
DEPT. CLERK

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | No. 3:20-MC-_5003_ |
| OF THE UNITED STATES OF AMERICA | ) | |
| FOR AN ORDER AUTHORIZING | ) | **TO BE FILED UNDER SEAL** |
| THE INTERCEPTION OF WIRE | ) | |
| AND ELECTRONIC COMMUNICATIONS | ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, John Witsell, a Special Agent ("SA") with United States Homeland Security Investigations ("HSI"), and being duly sworn, depose and state as follows:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a HSI SA since the agency's creation in March 2003. Prior to the creation of HSI, I was employed as a SA with HSI's predecessor agency, the United States Customs Service, since October 2001.  I graduated the Criminal Investigator Training Program and the Customs Basic Enforcement School, conducted at the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the HSI Office of the Resident Agent in Charge in Knoxville, Tennessee (HSI Knoxville). I have received training, conducted numerous investigations related to, and do instruct other federal, state and local authorities in advanced training methods on the enforcement of the laws and regulations related to the smuggling and trafficking of goods, to include controlled substances, into and within the United States. The training and investigations in which I have participated have involved smugglers and drug trafficking organizations suspected of violating 18 U.S.C. § 545, import smuggling, 21 U.S.C. § 952, importation of controlled

1

substances, and 21 U.S.C. § 846 and § 841, conspiracy to distribute and possess with intent to distribute controlled substances. I also have prior law enforcement experience with over nine years as a Special Agent for the State of Tennessee and as an officer at the county and local level. I have participated in numerous investigations, searches, and arrest of individuals who were involved in Import Smuggling and the distribution of controlled substances.

3.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving quantities of controlled substances, including crystal methamphetamine and other controlled substances, I know the following:

      a.  the methods in which smugglers and drug traffickers conduct their business, including but not limited to their methods of importing and distributing drugs;

      b.  their use of conveyances in the conduct of their business;

      c.  their use of cellular telephones (cell phones) and other cellular communication devices;

      d.  their use of numerical codes and code words to conduct their transactions;

      e.  methods of laundering drug proceeds;

      f.  smugglers and drug traffickers oftentimes use cell phones to communicate about their drug trafficking activities (via telephone calls and / or text messaging) and that they oftentimes use the cell phones to take photographs of their drugs, drug proceeds, and/or stash locations;

      g.  smugglers and drug traffickers oftentimes conceal drugs and/or drug proceeds in vehicles to avoid law enforcement detection when transporting drugs and/or drug proceeds.

**I.    Definitions**

2

## Target Phones

4.    A cellular telephone bearing the number (770) 453-2457, International Mobile Equipment Identifier ("IMEI") 355685075260777 subscribed to by "Tracfone Wireless Inc.," and believed to be used by Eric Joseph NEAL, which is hereinafter referred to as "NEAL PHONE 2." NEAL PHONE 2 is serviced by Verizon Wireless.

5.    A cellular telephone bearing the number (678) 760-2992, International Mobile Equipment Identifier ("IMEI") 354912095179212 subscribed to by "Gissel Garcia, 1526 Black Hickory Place, Norcross, Georgia, 30093," and believed to be used by MARIA LNU, which is hereinafter referred to as "MARIA PHONE 2." MARIA PHONE 2 is serviced by T-Mobile.

6.    Collectively, NEAL PHONE 2 and MARIA PHONE 2 are hereinafter referred to as the "TARGET TELEPHONES."

## Target Subjects

7.    Eric Joseph Neal, a/k/a "Bones" ("NEAL"), Maria LNU ("MARIA"), Jeremiah Elrod ("ELROD"), Cody Seals ("SEALS"), Nick Delozier ("DELOZIER"), Jacob Horne ("HORNE"), Hard Tymes ("TYMES"), Delaney Aker ("AKER"), Zach Haught ("HAUGHT"), Chad Allen ("ALLEN"), Skylar Kratohwil ("KRATOHWIL"), Luis Fernando Pena Fierro ("PENA"), Kathryn Stone ("STONE"), FNU LNU ("305"), Noah Coker ("COKER"), Jorge Martinez ("MARTINEZ"), Andrew Farr ("FARR"), Kristie Webb ("WEBB"), Austin Rudd ("RUDD"), and others as yet unknown, hereinafter collectively the "TARGET SUBJECTS."

## Target Interceptees[1]

---

[1] The TARGET INTERCEPTEES are the subset of the TARGET SUBJECTS expected to be intercepted over the TARGET TELEPHONES.

3

8.      NEAL, MARIA, ELROD, DOLOZIER, HORNE, TYMES, AKER, HAUGHT, ALLEN, KRATOHWIL, PENA, STONE, 305, COKE, MARTINEZ, FARR, RUDD, and others yet unknown, hereinafter collectively the "TARGET INTERCEPTEES."

## Target Offenses

9.      Offenses enumerated in 18 U.S.C. § 2516, that is, offenses involving violations of:

a.   Distribution and possession with intent to distribute controlled substances, including methamphetamine, and the conspiracy to distribute and to possess with intent to distribute controlled substances, including methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

b.   Use of a communications facility to commit, cause and facilitate drug trafficking activity, in violation of 21 U.S.C. § 843(b);

c.   Maintaining a premises for manufacture, distribution, or use of controlled substances, in violation of 21 U.S.C. § 856;

d.   Possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c);

e.   Conducting or attempting to conduct financial transactions with the proceeds of a specified unlawful activity with the intent to promote the specified unlawful activity or to conceal or disguise the proceeds, and the conspiracy to conduct or to attempt to conduct such financial transactions, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h); and

4

f.   Aiding, abetting, counseling, commanding, inducing, or procuring the commission of any of the above offenses against the United States, in violation of 18 U.S.C. § 2,[2] hereinafter all collectively the "TARGET OFFENSES."

## II.   Purpose of the Affidavit

10.   This Affidavit is being submitted in support of an application for an order authorizing the interception of wire and electronic communications over the TARGET TELEPHONES, concerning violations of the TARGET OFFENSES, for a period of thirty (30) days measured from the earlier of the day on which law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

11.   The authorization given applies to the TARGET TELEPHONE numbers listed above, and also to any other telephone number subsequently assigned to an instrument bearing the same international mobile equipment identification number used by the TARGET TELEPHONES, and to any other international mobile equipment identification number to which the TARGET TELEPHONE numbers referenced above are assigned, within the thirty-day period. The authorization is also intended to apply to the TARGET TELEPHONE numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the TARGET TELEPHONES while the telephones are off the hook or otherwise in use.

12.   As a result of my personal participation in this investigation and reports made to me by other law enforcement offficers, and information obtained from confidential sources, I am familiar with all aspects of this investigation.  On the basis of this familiarity, and on the basis of other

---

[2] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense for Title III interception enumerated in 18 U.S.C. § 2516, there also is probable cause to believe that the TARGET SUBJECTS of the investigation have aided and abetted and are aiding and abetting the enumerated substantive offenses.

5

information that I have reviewed and determined to be reliable, I declare that the facts contained in this affidavit show that:

    a. There is probable cause to believe that the TARGET SUBJECTS, and others yet unknown, have committed, are committing, and will continue to commit violations of the TARGET OFFENSES.

13. Additionally, based upon the investigation in this case, there is probable cause to believe the following.

    a. Particular wire and electronic communications of the TARGET INTERCEPTEES and others yet unknown, concerning the TARGET OFFENSES, will be obtained through the interception of wire and electronic communications occurring to and from the TARGET TELEPHONES; and

    b. The communications will likely identify and provide admissible evidence concerning:

      i. The TARGET OFFENSES

      ii. The names, telephone numbers, and locations of the TARGET SUBJECTS, their associates, their drug suppliers (both domestically and potentially internationally), their workers, and other types of co-conspirators

      iii. The leadership of the drug trafficking organization ("DTO")

      iv. The dates, times, and places for commission of the illegal activities

      v. The location, receipt, administration, control, management, and disposition of the DTO's illegal narcotics, firearms, assets, and other materials

      vi. The nature, scope, places, methods of operation; and

      vii. The existence and location of records documenting the business of the DTO.

6

14.     Normal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail.

**III.     Basis of Information**

15.     I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

    a.   My experience investigating crimes generally, and drug trafficking offenses specifically.

    b.   Oral and written reports, and documents about this investigation that I have received from members of local and federal law enforcement agencies, and other law enforcement agencies and databases;

    c.    Physical surveillance and video surveillance conducted by law enforcement;

    d.   Confidential sources;

    e.   Public records;

    f.   A review of pen register information, cellular telephone toll records, cellular telephone geolocation information, caller identification information, and cellular telephone subscriber information;

    g.   Consensually recorded and documented calls and text messages;

    h.   Controlled drug purchases from some of the target interceptees;

    i.   Text Message Search Warrants;

    j.   Facebook Account Search Warrant.

    k.   Facebook Title III interception of a Facebook account associated with NEAL.

l.    TITLE III interception of NEAL PHONE[3] and MARIA PHONE 1.

16.    Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception and recording of the requested wire and electronic communications, I have not included each and every fact known to me concerning the ongoing investigation. I have presented only the facts that I believe are essential to establish probable cause for an order authorizing the interception and recording of wire and electronic communications described in this Affidavit.

## IV.    BACKGROUND ON TARGET INTERCEPTEES AND SUBJECTS

17.    Information about the TARGET INTERCEPTEES and TARGET SUBJECTS comes from the non-exhaustive list of information delineated above in the "Basis for Information" paragraph.

18.    Through review of all of this information, and based on what law enforcement knows now, the following TARGET SUBJECTS have been identified:

a.    NEAL is a prisoner incarcerated in a state prison in Georgia that serves as broker of methamphetamine and other narcotics. NEAL was the user of NEAL PHONE and is the user of NEAL PHONE 2. NEAL uses Facebook and cell phones to coordinate with his customers and his suppliers to arrange illegal narcotics transactions. NEAL has an extensive customer base to buy, transport, and sell methamphetamine he brokers from his sources of supply. NEAL is believed to be a member of the Ghost Face gang.

b.    MARIA is a source of supply for NEAL and the user of MARIA PHONE 1 and MARIA PHONE 2. Based on surveillance, text message search warrants, geolocation data, and extensive law enforcement records research, law enforcement believes that MARIA has

---

[3] NEAL used a series of telephone numbers and two separate devices that are all referred to as NEAL PHONE in this affidavit. As described below, NEAL used a series of telephone numbers on a single device, IMEI number 355987104099303. He did this until on or about February 11, 2020 when NEAL kept telephone number (470) 622-1272 but switched to a new device, IMEI number 355987102088720. As noted below, NEAL is now using NEAL PHONE 2.

8

close connections with a Mexico based source of supply for methamphetamine and possibly heroin. MARIA operates her side of the DTO in the Northern District of Georgia. MARIA does not communicate using Facebook with NEAL. As noted below, she uses text messages to communicate with NEAL.

c.     ELROD is a customer of NEAL that distributes methamphetamine in Tennessee, Kentucky, and Georgia. He buys his methamphetamine through NEAL, and frequently meets with MARIA to pick up the methamphetamine he purchased through NEAL. As detailed below, law enforcement seized approximately 500 grams of methamphetamine from ELROD and KRATOHWIL after they wrecked a car in the Eastern District of Tennessee.

d.     SEALS was observed picking up a package from MARIA on January 9, 2020. He then fled state troopers attempting to stop him, shot one trooper with an assault rifle, and was in turn shot himself by law enforcement. SEALS's vehicle was searched after the shooting and approximately 1.5 kilograms of methamphetamine and 500 grams of heroin were discovered in his vehicle. He is currently incarcerated in state prison in Tennessee on state attempted murder and drug charges.

e.     DELOZIER coordinates the shipment of drugs for NEAL. He is a distributor of methamphetamine for NEAL, and he operates in the Northern District of Georgia.

f.     HORNE is a suspected transporter for NEAL. Facebook messages by NEAL was discovered through a Facebook search warrant that asked HORNE to drive to Mexico to pick something up for him.

9

g.     TYMES is believed to be an inmate in the state prison system of Georgia. Possibly a fellow Ghost Face gang member with NEAL. He works with NEAL to distribute narcotics from various suppliers.

h.     AKER is a distributor and transporter of narcotics purchased through NEAL.

i.     HAUGHT is believed to be in charge of money laundering and money transfer operations for the DTO, coordinating payment for purchases of narcotics and sending money to Mexico on behalf of the DTO. He also purchases phone cards for NEAL to use in prison.

j.     ALLEN is a prisoner incarcerated in a state prison in Georgia that serves as broker of methamphetamine and other narcotics. ALLEN uses cell phones to coordinate with his customers and his suppliers to arrange illegal narcotics transactions. ALLEN appears to have an extensive customer base to buy, transport, and sell methamphetamine he brokers from his sources of supply. ALLEN is believed to be a leader of the Ghost Face gang. ALLEN is believed to be supplied with methamphetamine and other narcotics by MARIA. ALLEN is believed the be the user of telephone number (769) 207-2671. On or about February 15, 2020, Allen, using that number, texted MARIA on MARIA PHONE 1 and stated, "Mami, hey, do you want pool table will deliver and set up for 9 z's and $700 cash or will do for half key also I'm about ready u to send old girl tip to." He then texted again, "you um starting over again so I wont have but mabey 2200 now k let me grab a whole ND owe rest." In these text messages, based on my training and experience as well as the context of this investigation, I believe that ALLEN was offering to deliver somethings, possibly weapons or an actual pool table in exchange for 9 ounces of methamphetamine (zips or z's) and $700 cash. In the alternative, ALLEN offered to do the same for half a kilogram of methamphetamine (half key).

10

k.  KRATOHWIL is a customer of NEAL that distributes methamphetamine in Tennessee, and Georgia. He buys his methamphetamine through NEAL, and meets with MARIA to pick up the methamphetamine he purchased through NEAL. As detailed below, law enforcement seized approximately 500 grams of methamphetamine from ELROD and KRATOHWIL after they wrecked a car in the Eastern District of Tennessee.

l.  PENA is believed to serve as a lieutenant to MARIA in the distribution of methamphetamine and other narcotics. PENA is known to travel with MARIA to distribute methamphetamine, and is believed to serve as a transporter of narcotics on MARIA's behalf. When MARIA was pulled over by law enforcement on January 9, 2020, PENA was a passenger in the car and handed law enforcement Mexican identities papers with his name.

m.  STONE is a customer/associate of NEAL that distributes methamphetamine in Georgia that she buys through deals brokered by NEAL. STONE is the user of (706) 659-6157. The number used by STONE is associated in public databases with a Krystal Stone. The user of this phone buys methamphetamine through NEAL, and meets with MARIA to pick up the methamphetamine she purchased through NEAL. The name Krystal is then referenced in a conversation detailed below between STONE and NEAL. But law enforcement isn't certain who is actually using the phone at this time.

n.  305 is suspected to be a source of supply, or an associate of a source of supply of narcotics for MARIA. Based on intercepted text message conversations with MARIA, 305 has supplied MARIA with narcotics on at least one occasion.

o.  COKER is a prisoner incarcerated in the state prison system in Georgia that serves as broker of methamphetamine and other narcotics. COKER uses cell phones to coordinate

11

with his customers and his suppliers to arrange illegal narcotics transactions. COKER appears to have an extensive customer base to buy, transport, and sell methamphetamine he brokers from his sources of supply. COKER is believed a member of the Ghost Face gang. COKER is believed to be supplied with methamphetamine and other narcotics by MARIA.

p.     MARTINEZ is a close associate to MARIA in the distribution of methamphetamine and other narcotics. MARTINEZ is known to travel with MARIA to distribute methamphetamine, and is believed to serve as a transporter of narcotics on MARIA's behalf.

q.     FARR is a local distributor of methamphetamine that is supplied by NEAL. Local law enforcement officers arrested FARR for state firearm offenses on or about January 28, 2020. When he was interviewed by law enforcement officers that day, FARR admitted to law enforcement that he traveled to Georgia to pick up methamphetamine from someone named Eric. Prior to his release from custody on or about February 13, 2020, FARR was recorded on a jail telephone call claiming he was going to tell NEAL about his arrest and law enforcement interest in him. On or about February 13, 2020, after he was released from state custody on bond, he called law enforcement offering to cooperate against NEAL. FARR used telephone number (865) 761-9267 to contact law enforcement on February 13, 2020. That same day, law enforcement spoke with FARR in person and he agreed to cooperate against NEAL by purchasing methamphetamine from NEAL, and confirmed his number was (865) 761-9267. FARR likely hoped or expected some leniency in his state offense adjudication and/or sentencing for his cooperation. Because of the recorded jail call that indicated that FARR might contact

12

NEAL and alert him to law enforcement interest in NEAL, FARR was very specifically and repeatedly instructed to make contact with NEAL **only** in the presence of law enforcement and he agreed. Despite this explicit instruction, pen register data showed that even after this meeting he was in frequent contact with NEAL over NEAL PHONE and NEAL PHONE 2. For example, FARR was actually intercepted on February 17, 2020, calling NEAL on NEAL PHONE and discussing a purchase of heroin. FARR has not informed law enforcement about these contacts or his discussions with NEAL. Thus, law enforcement believes that FARR is still working with NEAL on his own to purchase methamphetamine and heroin without the consent of law enforcement.

r.     WEBB is a distributor of methamphetamine and heroin for NEAL. WEBB was intercepted over NEAL PHONE and MARIA PHONE 1 discussing driving down to Georgia to buy methamphetamine and heroin. On or about February 15, 2020, law enforcement believes that WEBB traveled to Georgia to pick up methamphetamine and heroin from MARIA. When WEBB changed the order to a larger amount of methamphetamine in addition to the requested heroin, MARIA was unable to fill the larger methamphetamine order right away. WEBB paid for the methamphetamine and heroin in cash and law enforcement believes that WEBB was scheduled to pick up the methamphetamine the following morning. But WEBB was instead arrested on or about February 15, 2020 by local enforcement after, independent of this investigation, law enforcement attempted to pull over the vehicle containing WEBB. Law enforcement discovered approximately 3 ounces of heroin in the vehicle that WEBB was traveling in when she was arrested. WEBB is currently incarcerated on state charges and is held in the state system in Georgia.

13

s.      RUDD is a distributor that worked with WEBB and NEAL and FARR to purchase methamphetamine and heroin and later distribute that heroin in Tennessee. Wire intercepts over NEAL PHONE captured RUDD texting with NEAL about a possible purchase of methamphetamine.

## V.      Prior Applications

19.    On or about February 14, 2020 Chief District Court Judge Pamela Reeves in the Eastern District of Tennessee, authorized the wire and electronic interception of a cellular telephone bearing the number (470) 622-1272, IMEI 355987102088720, and believed to be used by NEAL, and a cellular telephone bearing the number (470) 451-2896, IMEI number 354956075675855, and believed to be used by MARIA LNU, which is hereinafter referred to as "MARIA PHONE 1," with the following target subjects: Eric Joseph Neal, a/k/a "Bones" ("NEAL"), Maria LNU ("MARIA"), Jeremiah Elrod ("ELROD"), Cody Seals ("SEALS"), Nick Delozier ("DELOZIER"), Jacob Horne ("HORNE"), Hard Tymes ("TYMES"), Delaney Aker ("AKER"), Zach Haught ("HAUGHT"), Chad Allen ("ALLEN"), Skylar Kratohwil ("KRATOHWIL"), Luis Fernando Pena Fierro ("PENA"), Kathryn Stone ("STONE"), FNU LNU ("305"), Noah Coker ("COKER"), Jorge Martinez ("MARTINEZ"), and others as yet unknown. Interception began on or about February 15, 2020, and remains ongoing until on or about March 15, 2020.[4]

20.    On or about February 10, 2020 Chief District Court Judge Pamela Reeves in the Eastern District of Tennessee, authorized the electronic interception of the Facebook account with the account number 100040264270659, believed to be used by NEAL, hereinafter the "FACEBOOK ACCOUNT," with the following target subjects: Eric Joseph Neal, a/k/a "Bones" ("NEAL"), Maria LNU ("MARIA"), Jeremiah Elrod ("ELROD"), Cody Seals ("SEALS"), Nick Delozier

---

[4] The affidavit in the referenced application is fully incorporated herein.

14

("DELOZIER"), Jacob Horne ("HORNE"), Hard Tymes ("TYMES"), Delaney Aker ("AKER"), Zach Haught ("HAUGHT"), and others as yet unknown. Interception began on or about February 12, 2020, and remains ongoing until on or about March 12, 2020. Based upon electronic surveillance (ELSUR) record checks of the DEA, ATF, Immigration Customs Enforcement (ICE), and FBI indices on or about January 29, 2020, February 14, 2020, and February 24, 2020, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications to or from TARGET TELEPHONES, or of any of the TARGET SUBJECTS specified in this Affidavit, with the above exceptions.

## VI. FACTS ESTABLISHING PROBABLE CAUSE

21.    In this affidavit, I seek permission to initiate the interception of wire and electronic communications over the TARGET TELEPHONES.

### *Background*

22.    On or about December 12, 2019, in the Eastern District of Tennessee, there was a car accident. At least one eyewitness of the car wreck or the aftermath told law enforcement officials that after the wreck, they saw that there were two occupants of the vehicle, a passenger, KRATOHWIL, and a driver, ELROD.[5] KRATOHWIL got out of the vehicle and started running away from the accident carrying a pelican case (which looks like a rugged briefcase), and ran behind a grocery store. ELROD left the scene of the accident as well. Law enforcement officers arrived at the accident scene and were directed by the eyewitness to the area where they saw KRATOHWIL run. The eyewitness then told police that they believed both ELROD and KRATOHWIL were sitting in a nearby restaurant. Behind the grocery store, law enforcement

---

[5] Both KRATOHWIL and ELROD were identified later on December 12, 2019 by law enforcement when they were arrested.

15

found the pelican case, which contained approximately 500 grams of a substance that looked like crystal methamphetamine, hereinafter "methamphetamine." Based on my training and experience, as well as the context of this investigation, I strongly believe the substance was methamphetamine. ELROD and KRATOHWIL were located in the nearby restaurant and, after being advised of their rights, agreed to speak with law enforcement.

23.  KRATOHWIL told law enforcement that he and ELROD had recently traveled into the Eastern District of Tennessee from Georgia, where they had bought a large quantity of methamphetamine for distribution in the Eastern District of Tennessee.

24.  ELROD also spoke with law enforcement and admitted to law enforcement that he had been carrying methamphetamine that he and KRATOHWIL had purchased in Georgia. ELROD told law enforcement that he purchased methamphetamine from a prisoner, NEAL, in Georgia and brokered the methamphetamine deal using Facebook messenger as well as text messages. ELROD noted that he had been dealing with NEAL for the past several months and that he began dealing with NEAL after ELROD got out of prison. ELROD then showed law enforcement his phone and consented to law enforcement searching his phone. ELROD highlighted for law enforcement the Facebook profile of the man that he communicated with in order to purchase the methamphetamine.

25.  ELROD showed law enforcement a Facebook account with the user name of "Eric Joseph Neal" that was later confirmed to be NEAL's FACEBOOK ACCOUNT through a Facebook search warrant for the user name associated with the account ELROD showed to law enforcement. The user of the FACEBOOK ACCOUNT is named Eric Joseph Neal according to the account. The name and pictures on the FACEBOOK ACCOUNT match the Georgia state prisoner database profile for NEAL, who is currently incarcerated in the Georgia state penal system. Several pictures

16

posted in December of 2019 on the FACEBOOK ACCOUNT show NEAL in a setting consistent with prison, including metallic bunk beds in a concrete room.

26.     Law enforcement discovered Facebook messages from December 12, 2019, between the ELROD and the FACEBOOK ACCOUNT on ELROD's phone after ELROD consented to a search of his phone by law enforcement. Those conversations discussed ELROD "picking up 6 not 5" or words to that effect.  ELROD told law enforcement that the conversations related to ELROD purchasing 5 or 6 kilograms of methamphetamine from NEAL.  Law enforcement also observed a video sent from the FACEBOOK ACCOUNT that included the depiction of a large amount crystal methamphetamine being scooped out of a container. ELROD told law enforcement that he communicated with NEAL through Facebook and text messages and that NEAL would direct him where to go in order to make payment for, and then receive, kilogram quantities of methamphetamine.

27.     Law enforcement also discovered text messages on ELROD's cell phone to and from NEAL PHONE.  ELROD confirmed that NEAL PHONE was used by NEAL.  On December 12, 2019, NEAL texted ELROD "$BigTyma80." ELROD responded, "who is this? I reset my phone." NEAL replied, "Eric."  Then NEAL texted, "What time are you headed down?"  ELROD replied, "…Idk (I don't know) but will let you know."  NEAL replied, "I need a driver ready to go tomorrow they paying all expenses."  NEAL then sent a video of a large amount of what appears to be crystal methamphetamine being scooped.

28.     Law enforcement observed text messages between ELROD and NEAL, using NEAL PHONE, from later that same day.  ELROD texted, "I[m] a available."  NEAL replied, "Bet Let's get it."  NEAL then sent a link to "Maria's cash app."  After ELROD was arrested by law enforcement, NEAL repeatedly texted ELROD asking if he was ok.  ELROD told law enforcement

17

that during this text message exchange, he was arranging to buy methamphetamine from NEAL, who was using NEAL PHONE. The text messages arranged for ELROD to meet someone working for NEAL to pickup the methamphetamine and to pay "Maria" through a mobile phone application for the methamphetamine. Based on my training and experience, as well as the context of this investigation, including the video of methamphetamine being scooped, I believe that this string of text messages was about arranging a methamphetamine transaction.

29.     Law enforcement deemed ELROD to be a reliable source of information during the debriefing held above because they were able to independently verify nearly every bit of information given by ELROD. In addition to allowing law enforcement to view his messages with NEAL, ELROD identified two individuals to whom he had recently supplied methamphetamine. When law enforcement approached those individuals, they admitted to buying the methamphetamine from ELROD. After providing the above statement to law enforcement, ELROD was arrested on December 12, 2019 for the incident described above, by the State of Tennessee for drug offenses and was subsequently released on bond. Based on information available to the Government, ELROD again began to traffic methamphetamine before being arrested again in Tennessee for a second time after another car wreck on or about January 6, 2020, for a violation of parole from unknown state of Georgia offenses. ELROD was then extradited to Georgia after Georgia requested his extradition. He did not give a statement after this second arrest. I am not aware of any narcotics found at the scene of the second wreck. He remains in state custody at this time.

**NEAL PHONE AND MARIA PHONE 1**

30.     In December of 2019, law enforcement obtained a federal search warrant for any text messages stored by Verizon for NEAL PHONE for the period of September 1, 2019, until

18

December 16, 2019. Law enforcement received the return from Verizon on or about Thursday, December 18, 2019. A review of the available communications from Verizon revealed that NEAL was using NEAL PHONE extensively to discuss and broker drug transactions with a large number of contacts. One such contact was a person law enforcement believes is named Maria ("MARIA"), who was using MARIA PHONE 1.

31.     For example, on December 11, 2019, NEAL, using NEAL PHONE, and MARIA, using MARIA PHONE 1 had the following text message conversation[6]:

NEAL:       What is the address

MARIA:     I allways do bro allwsys give always help thats wats made me who i am today

NEAL:       My word I got your back 1000 percent you been good to me and I promise if need be I'll rob a nigga to make sure u straight. But I still need an address. LOL

MARIA:     1825 pleasant hill rd duluthga

NEAL:       I've got 4 RN now I owe a band can I get a whole one and at the least 9 zips and. I would owe you 1700 if I couldget 1 and half I would owe u 2650

MARIA:     Ill give u the zips that I owe u n a whole

NEAL:       Ok be. So I will owe you 800. I kinda like how you said that.

NEAL:       Ok so now I got more bad news mami but its all good I've had to do it a hundred times. I've only got 2000.

MARIA:     That's fine ill give you one

NEAL:       I live you and we will be back tomorrow

---

[6] In my experience, text message search warrant returns do not capture all portions of a text conversation. For example, data, such as gifs, voice memos, voice notes with the texts, pictures, etc, are not captured. Moreover, I know that NEAL is using multiple modes of communications and may be alternating between those modes during conversations. So the conversations produced herein have gaps that agents both see in the information returned from Verizon and potentially has gaps that agents cannot see.

NEAL:        So be ready to ride.

The following day the conversation continued:

NEAL:        I'm bout to cash app you a thousand. Dollars

MARIA:       Bet

NEAL:        And my bro bout to leave kentucky and bribg you the 800 plus more for another

             motor maybe 2

NEAL:        We just collecting mami

NEAL:        And I talked to blackie he say a driver is needed. For the bottom yea?

MARIA:       Oki

NEAL:        Cuz my bro and another driver to follow is ready

MARIA:       Bet

32.    Based on my training and experience, as well as the context within this investigation, I believe that NEAL and MARIA were arranging for NEAL to buy methamphetamine and have a contact in Kentucky bring payment and pick up the methamphetamine shipment. NEAL asked for an address, presumably for a methamphetamine pickup, and MARIA supplied one in the Northern District of Georgia. NEAL then stated that he had "4", or $4,000, right now (RN) and that he owes $1,000 (I owe a band). He asked for a kilogram and 9 ounces (a whole one and at least 9 zips.) I know that zips means ounces in narcotics conversations. MARIA replied that she would give NEAL a kilogram and the ounces that she owed NEAL. After NEAL revealed he only had $2,000 not $4,000 (I've only got 2000), MARIA replied that she will still give NEAL a kilogram. The following day, NEAL told MARIA that he would send a thousand dollars through a mobile application known as "Cash App" to MARIA and that he had a "bro" coming in from Kentucky to bring more cash and potentially buy another kilo (motor) or two.

20

33.     On or about December 17, 2019, NEAL, using NEAL PHONE, had a text conversation with STONE, who was using telephone number (706) 659-6157.

NEAL:       needs 6500 to fix my face with cartel.  And yall went in the pack and fucked it up I don't have days to wait I don't have 1 day more to wait my life on line id be dead ass egongo if you sent them to that address.  To the folks that popped en like the been asking me.  But nah because I give a fuck and im solid af I keep my self in the skillet.

STONE:      is fucking stupid whos to say he want to go to jail tomorrow then what krystal is homeless krystels 260 kids done have one gift for Xmas from me with that be

NEAL:       ve a fuck

STONE:      what you said to do.  But onnce again u don't fucking think b4 u say shit This shit mess us a friendship.  So even if today woukd have been smooth fu us I wasn't going to fuck with yall on a dope level anyways.

34.     Based on my training and experience, and the context within this investigation, I believe that during this conversation I believe NEAL blamed STONE for failing to make the proper payment for methamphetamine and thus for his owing the "cartel" money.  NEAL told STONE that he owed $6500 [6500] to the "cartel" and that he blamed STONE for messing it up [yall went in the pack and fucked it up] and now he fears he might be killed because of it [I don't have 1 day more to wait my life on line id be dead].  NEAL told STONE that he was taking the blame and taking the heat [solid af I keep my self in the skillet].  STONE then mentioned her kids not getting Christmas gifts and blamed NEAL for messing up a friendship.  STONE concluded by stating that

she hadn't wanted to work with NEAL on drugs anyways [wasn't going to fuck with yall on a dope level].

35.     In December of 2019, based on the Verizon subpoena returns and a text message search warrant described above, law enforcement learned that NEAL changed the telephone number that he was using over NEAL PHONE.  On or about December 19, 2019, a Facebook friend on NEAL's Facebook account, the FACEBOOK ACCOUNT, described above, wrote him asking for his number "lemme get your number."  NEAL responded "tm4705719366."  Based on my training and experience, I believe the letters "tm" preceding the number likely means "text me" at the new number NEAL was using on NEAL PHONE, (470) 571-9366.  On or about December 21, 2019, NEAL, using the FACEBOOK ACCOUNT, asked a Facebook friend to call him at the new number.  Verizon confirmed to law enforcement that NEAL PHONE continued to be serviced by VERIZON, albeit with a new telephone number.  This new number had the same IMEI number, 355987104099303, as the previous number used by NEAL.

36.     Law enforcement learned through a federal search warrant for text messages stored by Verizon to and from NEAL PHONE, that on or about December 23, 2019,  NEAL, using NEAL PHONE, texted with ELROD, who was using telephone number (762) 219-6054.

> NEAL (9:45am):     If you are ready, let's go
>
> NEAL (1:31pm):     I'll call you right back

At 2:31pm, pen register data showed that there was then a call from ELROD to NEAL PHONE that lasted 24 seconds.

> ELROD (2:32pm):     Can u tell me wht Larry's talking about?
>
> NEAL (2:44pm):     I was funna fuck with him on a couple zips until I found out 12 whipped in that bih.

22

At 2:51pm, pen register data showed that there was a call from NEAL PHONE to ELROD that lasted approximately 3 minutes.

> ELROD (2:51pm):     Ok 12 went into his place?  When?
>
> ELROD (3:30pm):     so whs the deal maria told me to wait a bit?? Its funny tht she say come and then tell me to wait.

37.     Based on my training and experience, as well as the context within the investigation, I believe that during this call NEAL and ELROD were planning for ELROD to come pick up a load of methamphetamine from MARIA and discussed a co-conspirator possibly being investigated by the police.  NEAL first asked ELROD at 9:45am if ELROD was ready to go drive to pick up the methamphetamine (if you are ready, let's go).  At 1:31pm, NEAL told ELROD he was going to call him.  At 2:31, ELROD then placed a call to NEAL.  ELROD then asked NEAL about someone named Larry.  NEAL responded that he was going to sell Larry some ounces of methamphetamine (couple of zips) but he learned that the police (12) were around Larry. Based on my training and experience, I know that "12" is common slang amongst criminals for the police.  NEAL followed up his text about the police and Larry with a 3-minute call to ELROD at 2:51pm.  At the same time, ELROD texted NEAL asking for more information about the police and Larry (12 went into his place? When?).  Finally, ELROD complained to NEAL that after MARIA told ELROD to show up for a methamphetamine pickup, she then told him to wait (so whs deal maria told me to wait a bit???).

38.     On or about December 23, 2019, law enforcement obtained a federal search warrant for text messages stored by Verizon for MARIA PHONE 1.  Based on the return from Verizon, law enforcement observed messages to and from MARIA using MARIA PHONE 1 to traffic narcotics. For example, on or about December 18, 2019, MARIA, using MARIA PHONE 1 had a text

23

message conversation with an unknown person ("305") using a Miami, Florida telephone number (305) 202-0071.

> MARIA (2:02am):     Gm gm gm lil nigga baby
>
> MARIA (2:35am):     I need one motor
>
> MARIA (2:35am):     For a ford mustang
>
> MARIA (2:35am):     sent to augusta
>
> MARIA (2:36am):     If I leave rn I will be home at lunchtime w ur check
>
> 305 (2:45am): My check?? Nigga you owe them folks, not me. I'm broke as fuck cuz I've put all my money in to help u and I can't even get the 10 to take care of my folks
>
> MARIA (2:51am):     U will today
>
> MARIA (3:30am):     Do I go?

Pen register data then showed that approximately 3.75 hours later, at approximately 7:20am there was then an approximately 5 minute phone call from 305 to MARIA PHONE 1. According to text message search warrant returns, the text message conversation then continued:

> 305 (7:23am):     I'm going to get my Dakota. In Dawsonville
>
> MARIA (7:25am):     U need a ride?
>
> 305 (7:24am):     Nah. I'm omw Now
>
> 305 (7:24am):     Rather lyft.
>
> 305 (7:24am):     Much safer
>
> MARIA (7:28am):     Yes.

Pen register data then showed additional phone calls from 305 to MARIA PHONE 1 at 8:32am (1 minute and 37 seconds long); at 9:08am (1 minute and 12 seconds long); at 12:13pm (9 seconds

long); at 12:14pm (6 seconds long); a call from MARIA PHONE 1 to 305 at 12:20pm (3 seconds long) and one final call from 305 to MARIA PHONE 1 at 12:22pm (3 seconds long)

39.     Based on my training and experience, as well as the context within this investigation, I believe that during this text message conversation and contemporaneous phone calls with unknown content, MARIA arranged to purchase a kilogram or some other quantity of methamphetamine or cocaine from 305. After telling him good morning [gm gm gm] Maria told 305 that she needed a kilogram of methamphetamine [one motor] sent to Augusta. In past conversations, Maria appears to refer to kilograms of narcotics as "motors." She promised to pay him stating she will bring him "ur check." 305 responded that MARIA owed someone else the money [u owe them folks not me] but MARIA promised get him money today [u will today]. MARIA and 305, 3.75 hours later, then had an approximately 5 minute conversation over the telephone. I believe that during this call, and the calls that followed the text message conversation, MARIA and 305 finalized the details of the methamphetamine sale because shortly after that call, 305 and MARIA appeared to be arranging to meet. 305 told MARIA he was in Dawsonville, which is just north of Atlanta, Georgia. MARIA offered him a ride, but 305 told MARIA he was going to take a Lyft ride-sharing service instead, stating that it was "Much safer." Based on my training and experience, I know that recently drug traffickers have begun using ride-sharing services such as Uber and Lyft to transport narcotics because they feel as though they are less likely to be pulled over by law enforcement and/or lawfully searched if they use those services. Based on my training and experience, and the context within the investigation, I also believe that the 5 minute phone call that occurred in the middle of the above text message conversation about narcotics was about narcotics trafficking. I also believe that the six phone calls that came after the text message conversation

involve MARIA and 305 finalizing the details of their planned meeting as well as trying to reach one another over the phone (calls of 6, and 3 seconds in duration).

40.     On or about December 23, 2019, law enforcement also obtained another federal search warrant for text messages stored by Verizon for NEAL PHONE. The return revealed that NEAL PHONE was still communicating about drug sales. For example, on December 23, 2019, NEAL PHONE, used by NEAL, texted with MARIA PHONE 1 used by MARIA.

NEAL:       I need your cash app info

MARIA:      3980 florida ave, atlanta 30360

NEAL:       Ok I just got it mami

NEAL:       Hey are u mobile cuz I've got 10 they hour north Chattanooga

NEAL:       Otw cdown

MARIA:      U got wat

MARIA:      C town

NEAL:       6500 ours to you and 3500 Jale

…

MARIA:      The debt for two keys is 7600

MARIA:      And we had an old tab

NEAL:       But honestly

MARIA:      Bring the 76

41.     Based on my training and experience, as well the context of this investigation, I believe that during this text message conversation NEAL and MARIA were arranging a meeting at a location in Atlanta (3980 florida ave, atlanta 30360) to have associates of NEAL purchase methamphetamine who were driving down to Atlanta from Tennessee through Chattanooga (Hey

26

are u mobile cuz I've got 10 they hour north Chattanooga). The two discussed prices and debt, with NEAL initially stating that he was able to pay $10,000 to MARIA (6500 ours to you and 3500 jale). MARIA stated that NEAL owed $7600 dollars for two kilograms (keys) of methamphetamine. And then MARIA told NEAL to make sure that NEAL's associates brought $7600 to pay for the two kilograms (Bring the 76).

42.     Pen register data on NEAL PHONE alerted law enforcement that on or about January 2, 2020, NEAL switched telephone numbers for a third time again but continued to use NEAL PHONE as the physical device. Verizon told law enforcement that NEAL continued to use NEAL PHONE with the same International Mobile Equipment Identity ("IMEI").  According to Verizon records and pen register data, law enforcement learned that the new telephone number assigned to NEAL PHONE was (470) 622-1272. Based on my training and experience, as well as my conversations with Verizon and other cell service providers, I know that users can change the telephone numbers associated with a cell phone and can maintain the same IMEI number.  They can also change cell phones and keep the same phone number on the new phone. In this case, NEAL has changed his cellphone number several times using the same device, NEAL PHONE, but has kept the same device with the same IMEI number.   That recently changed, as is noted below.

43.     On or about February 11, 2020, law enforcement learned from Verizon representatives that NEAL was using a new IMEI number, 355987102088720, while keeping his same phone number, (470) 622-1272.  This was the number for NEAL PHONE.

### Drug Seizure

44.     On or about December 23, 2019, law enforcement obtained a federal search warrant for geo-location on MARIA PHONE 1, which runs for 60 days. On or about January 9, 2020, law

27

enforcement conducted surveillance on MARIA, who was sitting in a hotel in northern Georgia according to the geo-location pings from MARIA PHONE 1. A car that law enforcement had observed MARIA driving earlier was parked outside the room and law enforcement suspected MARIA was inside. Law enforcement observed a man drive up to MARIA's hotel room, go inside, and emerge with a black duffel bag. Later that same day, law enforcement observed a vehicle with Tennessee plates pull up to the same hotel room. A man entered the room and then emerged carrying a Doritos bag. The vehicle then headed north back towards Tennessee. The man driving that vehicle was Cody Seals ("SEALS"). When two troopers with the Tennessee Highway Patrol tried to pull over SEALS, he sped away and fired shots at a trooper attempting to stop him. During the car chase, SEALS wrecked his vehicle and emerged from the vehicle with an assault rifle. SEALS began shooting at the trooper nearest to him and shot that trooper in the leg. SEALS continued to fire his assault rifle and was then shot in the head by the second trooper who arrived on the scene of the wreck a few moments after SEALS began firing at the first trooper. In SEALS' vehicle, law enforcement discovered approximately 1.5 kilograms of a crystal substance believed to be methamphetamine and 500 grams of a powdery substance believed to be heroin. SEALS was arrested on Tennessee attempted murder and drug offense charges and remains in custody. He did not give a statement to law enforcement.

45. MARIA was observed leaving the hotel room later that day, was stopped by law enforcement in a traffic stop, and she provided a fake ID to law enforcement. She was allowed to proceed on her way.

**MARIA PHONE 2**

46. On or about February 15, 2020 law enforcement began the lawful interception of electronic and wire communications over MARIA PHONE 1 and NEAL PHONE. MARIA was intercepted

28

over MARIA PHONE 1 stating that her phone was broken, and subsequently, MARIA PHONE 1 stopped being used within 12 hours of the wiretap commencing. Law enforcement believes that she may fix the phone because before MARIA ceased using MARIA PHONE 1 she alluded to her need to get that phone fixed.

47. On or about February 16, 2020, law enforcement intercepted NEAL, using NEAL PHONE, communicating with MARIA, using MARIA PHONE 2 in a telephone call as follows:

MARIA: Hello?

NEAL: Mami?

MARIA: Yeah.

NEAL: Uh, give her 1 1/2 "JALE" and three (3) "Dog food" that accounts for 91-50. That leaves, uh, 850 for me.

MARIA: Okay. So they don't want the three (3) no more? [Voices overlap]

NEAL: I'ma give you [Audio breaking up] tonight. Huh?

MARIA: So, they don't want the three (3) no more?

NEAL: Uh...., I don't know. Let me do the math on three (3) of them because she wanted, she wanted dog food, mostly dog food, right?

MARIA: I gave her, I gave her dog food.

NEAL: How much dog food you get her?

MARIA: Three (3).

NEAL: You gave her three (3) dog food? She gave you ten thousand (10,000.00)? I'm not finding shit. if she gave you 10 thousand so, that will be, twelve (12), shit...., that's thirty-six hundred (3,600.00) which leaves, I'll tell you what, it'll work so, let's see take away thirty-seven hundred (3,700.00) for one (1) that leave twenty seven hundred (2,700.00) type of way, eighteen fifty (1,850) for a half. That leaves eight-fifty (850), yeah just give her 1 1/2.

MARIA: Okay. i thought you wanted three (3) of them?

29

NEAL:        [Stammers] she don't have enough. [Laughs]

48.      Based on my training and experience, as well the context of this investigation, I believe that during this phone conversation NEAL and MARIA discussed a methamphetamine and heroin transaction that NEAL brokered between MARIA and WEBB. NEAL asked MARIA to give WEBB 1 ½ kilograms of methamphetamine and three ounces of heroin for a total of $10,000, with NEAL taking $850 as his "cut" (Uh, give her 1 1/2 "JALE" and three (3) "Dog food" that accounts for 91-50. That leaves, uh, 850 for me.)  Based on my training and experience, I believe that "JALE" can be slang for work, or drugs.  MARIA then informed NEAL that she already sold the heroin to WEBB, and indicated that the methamphetamine transaction still had not occurred (I gave her, I gave her dog food.) NEAL seemed surprised and asked MARIA if she gave WEBB 3 ounces of heroin (You gave her 3 dog food?) and asked MARIA if WEBB already paid Maria $10,000 (She gave you 10,000?).  Neal then re-worked the math with MARIA on what WEBB should receive in methamphetamine due to the fact that WEBB did not bring enough money for the 1 ½ kilogram of methamphetamine and the three ounces of heroin.

49.      Based on a voice comparison, I know that the same person, MARIA, is the user of MARIA PHONE 1 and MARIA PHONE 2.

50.      On or about February 16, 2020, NEAL, using NEAL PHONE, texted with MARIA, using MARIA PHONE 2 as follows:

    MARIA:        What all do I giver her

    MARIA:        She gave me 10k last night  [The above call then occurs after this text, but before the following text]

    NEAL:         If you can give her 2 whole u know she's good for it and she spends good she will still owe me 1250 a band to u and the other 250 towards my tab she's consistent

    MARIA:        Ok

30

51.     Based on my training and experience, as well the context of this investigation, I believe that during this text message conversation between NEAL and MARIA, MARIA asked NEAL what she needed to give to WEBB (What all do I giver her). MARIA informed NEAL that WEBB gave her $10,000 the previous night (She gave me 10k last night).  At this point in the text message conversation, NEAL and MARIA then spoke on the phone in the telephone conversation discussed above about drug prices, the amount of money already paid, and what drugs could be supplied for that payment.  After speaking with MARIA on the phone and running the numbers on how much product WEBB could get from MARIA given that she had paid MARIA $10,000, NEAL texted MARIA after that phone call and requested that MARIA give WEBB two kilograms of methamphetamine (If you can give her 2 whole.)

## NEAL PHONE 2

52.     On or about February 17, 2020 another prisoner began using NEAL's phone instead of NEAL.  Another voice, not NEAL's, began using NEAL PHONE on that date.  On February 17, 2020, NEAL, using his FACEBOOK ACCOUNT, sent photographs to a Facebook user believed to be MARIA, of three iphones and told MARIA "ok I'm changing phones and tell Chad I need his number."

53.     On or about February 17, 2020, NEAL, using NEAL PHONE, called Straight Talk Wireless, which uses the Verizon network, by dialing 611.  During the call, an unidentified employee of straight talk wireless asked NEAL if he was calling about NEAL PHONE.  NEAL replied that he was not, he was calling to activate a new line, with the new IMEI number 355685075260777, which is the IMEI for NEAL PHONE 2.

54.     Law enforcement obtained a subpoena return from Verizon on or about February 19, 2020, for the new IMEI number 355685075260777.  According to the subpoena returns of call history

31

on NEAL PHONE 2, NEAL, using NEAL PHONE 2 began contacting MARIA, using MARIA PHONE 2, on February 17, 2020, and has done so approximately 30 times in the two-day window for which the subpoena return provided information.

55.     The following day, on or about February 18, 2020, NEAL received a text message on NEAL PHONE that stated, "The phone number on your Chime account has been updated to (470) 453-7856" which, according to Verizon, was number for assigned to NEAL PHONE 2 from February 17, 2020 until on or about February 23, 2020.  As noted below, NEAL changed the telephone number assigned to NEAL PHONE 2 on February 23, 2020.   I know that Chime is a mobile banking system application that functions on cellphones. Based on my training and experience I believe that NEAL was in the process of transferring accounts from NEAL PHONE to NEAL PHONE 2 and when he entered the new phone number for NEAL PHONE 2 for his Chime account, an automated message was sent to NEAL PHONE confirming the change.

56.     On or about February 23, 2020, according to Verizon, NEAL changed the phone number assigned to NEAL PHONE 2 from (470) 453-7856 to (770) 453-2457, which is the telephone number on NEAL PHONE.  But NEAL did not switch physical phones, he just changed the telephone number assigned to the actual phone.  In other words, the IMEI number was not changed but the number was.  According to a federal pen register on NEAL PHONE 2, NEAL continues to use NEAL PHONE 2 to repeatedly call MARIA PHONE 2, even after the number was changed on February 23, 2020.

## VII. ANALYIS OF TELEPHONE RECORDS

### NEAL PHONE 2

57.     On February 18, 2020, a state administrative subpoena was sent to Verizon Wireless for records associated with NEAL PHONE 2, and records were received on February 19,

32

2020. NEAL PHONE 2 was activated on or about February 17, 2020. Thus we have call and text message history for NEAL PHONE 2 for two days from February 17, 2020 to February 18, 2020 which is "the covered period."

58. During the covered period, records show that 122 calls were placed to and from NEAL PHONE. The most recent call was on February 18, 2020. During the covered period, records show that 545 text messages were placed to and from NEAL PHONE 2. The most recent text message was on February 18, 2020.

59. During the covered period, 12 calls occurred between FARR, using (865) 761-9267, and NEAL PHONE 2. The most recent occurred on February 18, 2020.

60. During the covered period, 30 text messages occurred between FARR, using (865) 761-9267, and NEAL PHONE 2. The most recent occurred on February 18, 2020.

**MARIA PHONE 2**

61. On January 22, 2020, United States Magistrate Judge Bruce Guyton authorized a pen register/trap and trace device on MARIA PHONE 2, which began collecting data on December 23, 2019, and it still currently active. Thus, we have call and text message history for MARIA PHONE 2 from January 22, 2020 to February 18, 2020 which is "the covered period."

62. During the covered period, records show that 1,136 calls were placed to and from MARIA PHONE 2. The most recent call was on February 18, 2020. During the covered period, records show that 2,258 text messages were placed to and from MARIA PHONE 2. The most recent text message was on February 18, 2020.

63. During the covered period, 81 calls occurred between ALLEN, using (769) 207-2671, and MARIA PHONE 2. The most recent occurred on February 18, 2020.

64.     During the covered period, 47 text messages occurred between ALLEN, using (769) 207-2671, and MARIA PHONE 2.  The most recent text message was on February 18, 2020.

## VII.  Need For Interception

65.     Based on my training and experience, the experience of other law enforcement officers involved in this investigation, and all the facts set forth herein, it is my belief interception of wire and electronic communications over the TARGET TELEPHONES is the only available investigative technique that has a reasonable likelihood of achieving the goals of this investigation, which include:

    a.  The dismantling of the DTO through lawful prosecution and conviction of its members, leaders, and suppliers.

    b.  Identification of all significant contributors to the DTO.

    c.  Collection of evidence sufficient to prosecute all significant contributors to the DTO.

    d.  Seizure of narcotic shipments before they reach users.

    e.  Identification of the sources of supply for the DTO including sources of the supply that may be outside the DTO.

    f.  Collection of evidence sufficient to prosecute the DTO's sources of supply, including any international suppliers and co-conspirators.

    g.  Collection of evidence sufficient to prosecute and seize proceeds of the DTO's drug transactions, bulk cash smuggling efforts and/or money laundering efforts.

66.     Based on my training and experience, it is my belief that the interception of wire and electronic communications, in conjunction with the other investigative techniques currently being used in this investigation, is the only available technique that has a reasonable likelihood of

34

identifying the entirety of the DTO, to include all sources of supply of methamphetamine, who are believed to be based in or near Atlanta, Georgia and in Mexico. It is my belief that the interception of wire and electronic communications, as detailed herein, is the only available technique with a reasonable likelihood of securing the evidence sought, which is necessary to prove beyond a reasonable doubt the participation of all of the co-conspirators involved in the DTO, to identify all co-conspirators, and to identify the sources of supply. Numerous investigative procedures typically employed in an investigation of this type have been tried and have failed, reasonably appear to be unlikely to succeed if they tried, or are too dangerous to employ.

### Wiretap Interceptions

67. NEAL has a Facebook account, and on or about February 10, 2020, the United States sought and received Court authorization for a Facebook wiretap on NEAL's FACEBOOK ACCOUNT. Interception began on February 12, 2020. So far we've learned that NEAL will occasionally broker transactions using Facebook and have at least part of the discussion about a potential narcotics deal over Facebook. Moreover, as noted above, NEAL used the FACEBOOK ACCOUNT to tell MARIA he was getting a new phone, and sent photos of iphones to MARIA over Facebook. But NEAL doesn't solely use Facebook to communicate with potential buyers. NEAL, as noted above, also uses NEAL PHONE to communicate with potential buyers. We originally believed that NEAL did not use the FACEBOOK ACCOUNT to speak with MARIA, but we have subsequently learned that he does, and he discussed possible narcotics transactions with MARIA over the FACEBOOK ACCOUNT, but never in great detail. As such, while the Facebook wiretap is useful to identifying NEAL and getting a fuller picture of his communications, it cannot, by itself, accomplish the goals of this investigation. MARIA has a facebook account that she uses occasionally to speak with NEAL, but the conversations with NEAL alone do not

accomplish the goals of this investigation, and most of her communications with NEAL are over telephone calls and text messages. So the Facebook wiretap is not expected to provide much information about MARIA's associates, her operations, her DTO, or her suppliers.

68.      On or about February 15, 2020, law enforcement commenced lawful interceptions of wire and electronic communications over NEAL PHONE and MARIA PHONE 1. Law enforcement quickly intercepted drug trafficking related conversations by NEAL and MARIA over those lines as they worked to broker and set-up methamphetamine and heroin deals. MARIA stopped using MARIA PHONE 1 within hours of our interception commencing. On or about February 17, 2020, approximately 2 days after interceptions commence, NEAL stopped using NEAL PHONE. This application seeks the interception of the phones law enforcement now believes that MARIA and NEAL are using. While the brief interceptions of NEAL PHONE, and MARIA PHONE 1, were useful in pursuing the goals of this investigation, we were unable to fully accomplish the goals of this investigation in such an abbreviated period of interception. For example, while we learned a newly identified distributor of NEAL's, WEBB, was being supplied by MARIA, we still have numerous contacts on NEAL PHONE and now NEAL PHONE 2 that we have not identified and know very little about. Moreover during our hours-long interception of MARIA PHONE 1, we confirmed MARIA is distributor methamphetamine and heroin but we were unable to identify all of her co-conspirators, her supplier, any stash houses, or any conversion labs that we believe MARIA is employing as a part of her drug operation.   Since NEAL stopped using the NEAL PHONE, another prisoner has begun using the phone to arrange drug transactions with an unknown supplier and unknown distributors. NEAL occasionally gets a text message or a phone call over this line because it was his old phone, but the new prisoner using this phone has just replied with NEAL's new phone contact, NEAL PHONE 2, or has offered to relay the message. We do not

36

plan to listen over this phone much longer, or until NEAL stops receiving any messages over NEAL PHONE. Thus the interception of the TARGET TELEPHONES is necessary to accomplish the goals of this investigation.

69.     Based on the investigation to date, I know that NEAL is in prison in Georgia. This, as noted below, makes many traditional law enforcement techniques difficult or impossible to employ. For example, NEAL does not meet with his co-conspirators, suppliers, or his customers/distributors. Surveillance on a prisoner is obviously difficult or impossible, and would yield little or no useful information about his co-conspirators, suppliers, or customers.

### Counter Surveillance

70.     Important for several sections below, MARIA uses counter-surveillance techniques. Pen register data shows that MARIA has stopped using MARIA PHONE 1 periodically and appears to move around from hotel to hotel in order to distribute methamphetamine and possibly heroin for deals brokered by NEAL and others. MARIA is currently not using MARIA PHONE 1. MARIA appears to be using MARIA PHONE 2 currently. MARIA is also careful and has twice avoided giving out her actual cell phone number to hotels she has checked into by changing one digit in her actual number, which indicates a mindfulness of potential law enforcement investigations. In both instances, MARIA gave a telephone number that was one digit off of the telephone number on MARIA PHONE 2. Using lawful pings on phones believed to be used by MARIA, law enforcement identified a possible stash house used by MARIA for cash and/or drug storage. However, this house is located on a rural road and set back from any ideal physical surveillance locations on a large piece of property that would make it difficult to surveil. We know, through a federal Whatsapp pen register obtained on or about January 10, 2020, that MARIA uses Whatsapp to communicate with many of her possible co-conspirators. Whatsapp is an application that allows

37

users to text and make calls using end-to-end encryption that makes law enforcement interception of calls and texts difficult if not impossible. While she does not exclusively use this encrypted application, I know from my training and experience that criminals often use Whatsapp and other encrypted communication platforms to avoid law enforcement interception of their communications. On or about January 22, 2020, law enforcement viewed hotel surveillance video that showed two males traveling with MARIA checking her car with flashlights. Based on my training and experience, I believe that these individuals were looking for a possible vehicle tracker placed on her car by law enforcement.

71. NEAL has changed phone numbers at least three times during the past two and a half months of investigation and changed his physical cell phone twice.

## Surveillance (Vehicle Trackers, Geolocation Information, Physical Surveillance, and Pole Cameras)

72. As it relates to NEAL, surveillance is difficult to impossible since he is incarcerated. Moreover, he is not meeting with co-conspirators, customers, or his supplier(s). Surveillance would not help accomplish the goals of this investigation. Law enforcement has conducted surveillance on at least two occasions on MARIA, a suspected supplier of NEAL. Twice, law enforcement has set up surveillance on MARIA and attempted to fully identify her. On one occasion, law enforcement pulled her over for a minor traffic violation and she gave a false ID and was allowed to leave. Law enforcement has obtained hotel surveillance footage, and captured photographs of MARIA at various hotels where she was believed to be distributing kilogram quantities of methamphetamine. As noted above, on January 9, 2020, law enforcement observed SEALS go into a room where MARIA was distributing methamphetamine. SEALS was followed and law enforcement attempted to pull him over. He then shot one trooper with an assault rifle before he was shot by another trooper on the scene. SEALS' vehicle had approximately 1.5

38

kilograms of methamphetamine and 500 grams of heroin inside. Aside from the obvious danger of this law enforcement effort, this sort of surveillance reveals little of NEAL's involvement, does not identify those supplying MARIA, NEAL, or reveal the extent of NEAL's customer/distribution network. Nor does it identify any manner or means of bulk cash smuggling and/or money laundering efforts by NEAL or the broader DTO.

73.     The use of vehicle-tracking devices also has been contemplated in this investigation. I believe any attempt to install a vehicle tracking device could be detected by the DTO. Home/private use surveillance cameras are now common-place and often have night vision capability, the ability to detect movement, record, and alert the user via mobile devices. Even if a vehicle-tracking device is successfully installed on vehicles associated with the DTO, there is no reason to believe that the movements of the vehicle would allow agents to determine who is supplying narcotics or moving money on behalf of the DTO. Additionally, NEAL is incarcerated and does not drive in any vehicles. Law enforcement has observed MARIA driving a vehicle. While law enforcement could potentially track this vehicle, law enforcement is already aware of her general location through the use of a geo-location tracker on her cell phone. For the reasons described above, placing a tracker on this vehicle could be dangerous, reveal our investigation, and would yield little new information. As noted above, on or about January 22, 2020 law enforcement observed two males that travel with MARIA examining the exterior of her car with flashlights, which I believe was a search for possible vehicle tracking devices place on her car by law enforcement.

74.     Law enforcement is using geo-location phone tracking in this investigation. Law enforcement has utilized geo-location tracking on two phones used by MARIA, including MARIA PHONE 1 and MARIA PHONE 2. This information has been helpful to learn MARIA's

general location, but law enforcement cannot determine what she is doing in those locations, who she is meeting with, why she traveled to the locations in question, or with whom she was working at the time. Even if agents know where MARIA and other co-conspirators generally are, agents cannot know who they are meeting with, what they are speaking about, what they are doing, or how their organization operates from learning the movements of the co-conspirators alone. Agents also don't learn the breadth of the DTO, who the key players are, and the manner and means by which they control the flow of drugs and money. There are also serious limitations to GPS phone tracking. If phones are turned off or frequently dropped, agents often have no ability to track MARIA or other members of the DTO. Thus while geo-location trackers are helpful, they do not, by any means, accomplish the goals of this investigation on their own. Agents know where NEAL is, so there is little reason to track the location of any phones used by him.

75. Law enforcement has contemplated the use of a pole camera on a residence believed to be used by MARIA as a possible stash house, and may employ one in the near future. But this location is on a rural road, with poles for a potential camera monitoring activity at this residence that may or may not be feasible locations for a possible pole camera. Law enforcement is currently evaluating the possible risks/rewards of placing a pole camera in that location. Even if a pole cam is utilized at this location, law enforcement knows that pole cams have been discovered in the past, both during installation, which is a visible event, and once the pole cam is in place, which would jeopardize the investigation. Moreover, a pole cam at this residence, based on the locations available for a camera, might only yield vehicles traveling to the possible stash house, and likely could not tell us who was in the vehicles or what was transpiring inside the house. Thus, aside from the investigative risks pole cams provide, in this case, pole cameras may provide little information that would lead us to accomplishing the goals of this investigation.

**Confidential Sources**

76.    NEAL appears to deal with longtime friends and associates. ELROD initially agreed to give information to law enforcement but agents believe he then went back to working with NEAL based search warrant returns and pen register information. ELROD is currently back in custody and was transferred back to Georgia to face state offenses there. KRATOHWIL initially agreed to speak with law enforcement. He told law enforcement that he was working with ELROD to distribute methamphetamine, knew of NEAL and MARIA as sources of supply for ELROD, and claimed to have met MARIA. But KRATOHWIL had outstanding warrants out of the state of Georgia, and was extradited back to Georgia shortly after his arrest on State of Tennessee drug offenses after the wreck. KRATOHWIL later refused to make another statement when he was contacted by law enforcement. Diamond Loyd, a female member of the Ghost Face Gangsters was recently arrested by local law enforcement in Georgia. She agreed to speak with law enforcement and indicated that someone named "Maria" is a primary source of methamphetamine for the gang. She also identified numerous members of the gang, detailed some of their drug trafficking activities, and relayed her understanding of how the gang purchased methamphetamine from "Maria." While this information was very helpful in understanding how several of those distributing methamphetamine for MARIA operate, and who they are, she is unable to proactively cooperate because she is incarcerated. Moreover, while this information was helpful in accomplishing the goals of the investigation, law enforcement does not yet know if she can be a witness in a potential prosecution against members of MARIA's DTO. Loyd's possible testimony alone would not provide enough evidence to prosecute MARIA, who she could not fully identify, NEAL, who she did not name, or fully reveal the DTO's suppliers, transporters, brokers, or dealers. FARR, as noted above, reached out to law enforcement about possibly cooperating against NEAL.

41

FARR initially agreed to do so, but after careful instructions by law enforcement not to contact NEAL without law enforcement present under any circumstances, FARR has repeatedly and frequently contacted NEAL to set up a possible methamphetamine purchase that law enforcement has not authorized and that FARR has not told law enforcement about. As such, he is considered to be a co-conspirator, not a cooperator at this time.

77.     Interviews of subjects and their associates have been limited to persons already arrested or persons who have sought to cooperate with law enforcement in this investigation. Based on my experience and the experience of other agents in conducting investigations of persons involved in drug trafficking, it is my belief that if interviews were attempted of people not arrested, the individuals contacted would alert their co-conspirators of HSI's interest in their activities, causing them to flee or resulting in the possible concealment, movement, or destruction of documents, drugs, monies, and/or other evidence, which would make it more difficult for sufficient evidence to be obtained to identify and prosecute them.

## Undercover Agents

78.     No undercover agents have been able to infiltrate this DTO. It would not be possible to introduce an undercover agent to NEAL in prison. It appears he largely deals only with individuals he knows personally. Thus, I believe that any undercover officer would be regarded as highly suspicious and unlikely to learn any information from NEAL. MARIA appears to distribute to individuals directly referred to her through people she knows or has vetted through the Ghost Face gang leadership. Even if an undercover agent could potentially make a buy from NEAL or MARIA, such a buy would yield little new information about the DTO, and fall far short of accomplishing the goals of this investigation.

## Consensual Monitoring

79.    ELROD allowed law enforcement to look through his phone and messages with NEAL. But then he went back to trafficking methamphetamine with NEAL.  As noted above, KRATOHWIL initially agreed to speak with law enforcement before he was arrested and extradited back to the state of Georgia.  He is unwilling to work with law enforcement any further, invoking his right to counsel when law enforcement reached out to glean additional information. Law enforcement has not identified any associate of member of the DTO who would be in a position to agree to consensual monitoring.  Furthermore, there is the risk that any cooperator may, at any time, alert NEAL of law enforcement's interested in his operations, and permit him to destroy evidence, alter his operations, and thwart this investigations goals.

## Trash Pulls

80.    An investigative technique that sometimes provides valuable evidence is a "trash pull" or the collection and examination of discarded trash at a subject's business and/or residence.  As mentioned previously, NEAL is incarcerated, and so agents cannot do a trash pull on him.  Due to Maria's nomadic distribution, law enforcement has yet to identify a good location to attempt a trash pull. When MARIA is staying at a hotel, pulling her trash from that amongst the other guests would be nearly impossible.  Pulling trash from her room is also both risky to the investigation and any officers attempting to enter her room.  MARIA travels with at least one male, and sometimes two males to her hotel locations.  Law enforcement is considering a trash pull at the stash house, but because of its isolated location, agents are worried that an effort to pull the trash might be discovered.  Further surveillance is required to determine when the trash is placed outside, if any trash is place outside, and if a trash pull can be done safely.  As noted above, I know that narcotics traffickers frequently use surveillance cameras to protect their most valuable locations such as stash houses, and there is a significant risk that any trash pulling operation in this instance

43

would be discovered. Law enforcement believes they have identified at least one residence for MARIA, but it is a large apartment complex that does not sort its trash by individual unit, making any trash pull difficult to accomplish without anyone from the complex spotting law enforcement digging through the trash and unlikely to yield helpful evidence given the volume and mixed nature of the trash at that location.

## Mail Covers

81.     Mail covers are a service provided by the United States Postal Service (USPS), wherein a list of all sender and receiver names and addresses on each piece of mail received at a particular location can be obtained. The list is compiled by the mail carrier who would deliver the mail to the target location and then a list would be provided to the United States Postal Inspector who would provide the list to agents.  A mail cover was placed on a residence visited by MARIA, and that mail cover revealed several businesses receiving mail at that location that may be associated with the DTO or may be entirely legitimate.  Further investigation is required to determine what, if any role those businesses play in this DTO's operation.   Based on present information, the DTO transports drugs and money in vehicles and not the mail.  Therefore, agents do not believe that mail covers would be beneficial in identifying DTO co-conspirators or sources of supply of other illegal drugs.  As noted before, NEAL is in prison, and attempting a mail cover on his mail could alert him to our investigative efforts and would provide little to no useful information towards accomplishing the goals of this investigation.  Despite the receipt of some information from the residence associated with MARIA through a mail cover, that mail cover and any potential mail covers on other locations would yield little information, by itself, and without a wiretap, that could uncover the meaning of the mail coming into those locations, the contents of that mail, or otherwise fully accomplish the goals of this investigation.  Law enforcement plans to place a mail cover on

MARIA's possible residence address, but as noted above, this option is highly unlikely to provide much useful information, let alone accomplish the broad goals of this investigation.

## Grand Jury Subpoenas

82.     Based on my experience, training, and conversations with Assistant United States Attorney Kevin Quencer, who has considerable experience prosecuting the federal drug laws, I believe that subpoenaing persons suspected of being involved in this conspiracy, or their associates, would be unsuccessful in achieving the stated goals for this investigation.  Many of the conspirators are not fully identified.  Furthermore, conspirators brought before the grand jury would most likely invoke their Constitutional rights against self-incrimination and to the existence of the investigation.  This would cause the targets to become more cautious in their activities, flee to avoid further investigation or prosecution, or threaten the lives of confidential sources or others falsely suspected of cooperating.  That said, agents are planning to utilize subpoenas for bank records in order to investigate possible money laundering activity and to locate the proceeds of the DTO's drug trafficking.  Agents have also utilized subpoenas to learn the subscriber information of telephones and mobile payment applications involved in this investigation.

## Subject Interviews

83.     Based on my experience and the experience of other agents and officers working on this investigation, I do not believe further interviews of subjects or their known associates would produce sufficient information about the DTO, including the source of drugs, the financing of drug purchases, and the transshipment of methamphetamine and other drugs into our district or around the United Stats at this time. I believe that responses to interview questions would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrate the investigation. I know through being involved in other drug investigations

45

that, when confronted, subjects minimize their own involvement and protect others. Most concerning, the interviewed subjects would likely alert other DTO members, thereby compromising the investigation and resulting in the possible destruction or concealment of evidence or potentially placing cooperators in danger. After WEBB was arrested in Georgia, federal law enforcement officials were told that WEBB was in the hospital in custody for unknown reasons and therefore unavailable for a possible interview or statement. We are in close touch with local authorities, and if she makes a statement, we will quickly learn about it. Even if WEBB was available for an interview, the risk of her revealing the nature of our questions or even the existence of a federal investigation to our target subjects outweighs any potential benefits at this stage. WEBB is unlikely to know MARIA's source of supply, the locations of her stash houses or conversion lab, and is unlikely to understand the full breadth of MARIA's drug trafficking operation or the scope of MARIA's supplier's drug trafficking organization.

84.    As a general matter, it would be unwise to risk jeopardizing this investigation based on the unpredictable actions of co-conspirators. The risks associated with confronting co-conspirators about the DTO far outweigh the possible benefits. There is no way for law enforcement to know if the person approached will fully cooperate, or refuse to cooperate at all. Even if the individual agrees to be interviewed, there is no way to ensure that the information will be truthful or accurate. The individual could very well alert other DTO members, which could severely harm the investigation.

**Search Warrants**

85.    Law enforcement has already executed a series of search warrants for text messages from the TARGET TELEPHONES. These efforts have produced excellent information for our investigation, including the conversations noted above for the TARGET TELEPHONES.

46

However, this information, when obtainable, is not in real-time, and does not allow law enforcement to utilize real-time information about DTO activities to make seizures, conduct surveillance, or understand who is meeting with whom and when. In sum, text messages search warrants have been very helpful in accomplishing the goals of the investigation, but cannot, by themselves, accomplish those goals. Similarly, law enforcement sought and received a search warrant for NEAL's FACEBOOK ACCOUNT. This information was very helpful to this investigation, but took several weeks for Facebook to provide the sought information, and was thus providing only very old (in investigation terms) information that, by itself, could not give us the needed real-time look into DTO communications. When the investigation will not be compromised by the execution of federal search warrants, and actionable information is obtained, law enforcement is contemplating search warrants on ELROD's home, the potential stash house used by MARIA, MARIA's residence, and possibly a hotel room used by MARIA. This, of course, necessitates the acquisition of probable cause on those locations, which agents are working to develop. Law enforcement is planning to seek a search warrant for a Facebook account believed to be used by MARIA. While our past search warrant for NEAL's Facebook account proved fruitful in providing some details into his drug trafficking activities, and we expect similarly important evidence from MARIA's account, we know from her interactions with NEAL on Facebook, and pen registers on MARIA PHONE 1, and MARIA PHONE 2, that Facebook is not her primary method of communication. Moreover, data from Facebook is historical. While historical data can help build a case against MARIA and understand some of her drug trafficking operations generally, without real-time interception of her wire and electronic communications, law enforcement will be unable to fully accomplish the goals of this investigation, including seizures of narcotics and identifying MARIA's source of supply.

47

## Phone Toll Records

86.     Phone toll records, analyzed pen register/trap and trace information, and other records have been analyzed in this investigation and continue to be gathered for the TARGET TELEPHONES, and other phones used by DTO members.   Toll records have been of some use in identifying numbers frequently contacted by the TARGET TELEPHONES and other DTO-associated phones. However, there are limitations to this investigative tool.   These records serve only to confirm contacts between telephones.   Pen register/trap and trace devices only capture the telephone numbers of individuals involved in the DTO.  A Facebook pen register on NEAL's FACEBOOK ACCOUNT reveals the accounts with which he is communicating. But these pen register and toll records do not contain content of the conversations between the two parties, which is significant in the investigation of criminal conspiracies. In addition, these records do not provide the context of the conversation or the identities of the speakers. Such information is significant in the investigation of criminal conspiracies. It is known that some members of the DTO utilize communication devices not subscribed to or purchased in their names, which I believe is a method used to conceal their identities. As noted above, toll records and pen registers alone will not permit us to accomplish the goals of the investigation.

## Financial Investigation

87.     The financial investigation is only in its infancy. It is anticipated that through the use of law enforcement databases and bank record subpoenas, coupled with the sought electronic monitoring, the financial investigation will be advanced significantly. Preliminary financial inquiries have been performed on known subjects in the DTO but have yielded limited information. A complete and thorough financial analysis will be performed as this investigation progresses and more information of the subjects' financial standing will be revealed. To date, no specific financial

48

institutions have been identified that are being used by the DTO. Based on my training and experience, Mexico supplied and cartel linked distribution organizations like this one infrequently use the formal banking system, which may limit our ability to uncover the breadth and depth of financial dealings by this organization without the use of a wiretap and other investigation methods. Because NEAL is incarcerated, and based on the investigation so far, agents know that NEAL likely relies on electronic mobile payment applications on his phone and on other's phones to move his cut of any deals that he brokers. Agents have already sent subpoenas for information to Cashapp, one mobile application agents know NEAL has utilized in the past. Those returns revealed phone numbers that were associated with various account numbers transacting with NEAL, but did not reveal the amounts of transactions, which we are currently seeking through a new wave of subpoenas. After receiving a text message over NEAL PHONE that indicated that NEAL was using the mobile banking system Chime, law enforcement is in the process of seeking a subpoena to learn more about NEAL's account and use of Chime.

## Prison Efforts

88.    Law enforcement has considered seeking to find and seize the cell phone that NEAL is using in prison. But this possible technique presents several problems. First, it can be hard to find an illicit cell phone in prison. I know from my training and experience that prisoners frequently have excellent places to hide their illicit cell phones and those hiding places are not always located in a prisoner's cell. Second, any effort to find NEAL PHONE in prison could potentially alert him to the existence of an investigation into his activities and allow him to change his mode of brokering narcotics transactions, destroy evidence, and/or alert his co-conspirators to an investigation. Third, based on law enforcement to law enforcement communications, there are significant concerns that other persons in the prison facility that houses NEAL could tip NEAL off

49

that law enforcement was investigating him or even that law enforcement requested that his cell phone be searched for and seized. Fourth, it is possible to delete information from Facebook accounts and phones that can make extraction difficult if and when a phone is later seized. Finally, the information we would expect to obtain from a cell phone seizure is information that we already largely have. As noted elsewhere, pursuant to federal search warrants we already have a wealth of historical information about NEAL's text messages and the FACEBOOK ACCOUNT's contents. What is needed to advance this investigation is real-time conversations over the TARGET TELEPHONES that can lead to the identification through surveillance, traffic stops, and other law enforcement techniques including other possible wiretaps, of sources of supply, customers, drug shipment times and locations. Historical information, while helpful, is normally not actionable information that can lead to law enforcement using that information, in real-time to achieve the goals of the investigation.

89.     Law enforcement plans to seek jail calls from NEAL's prison facility later in the investigation, likely when the investigation moves from a covert investigation to an overt investigation. Based on law enforcement to law enforcement communications, I know that any investigation requests on a particular prisoner can lead to that prisoner becoming aware of the investigation, although we are exploring a possible way to do this without compromising the investigation through our contacts within the Georgia state prison system. I also know that in many prison facilities, multiple inmates can trade, share, and use the same phone identification information when placing calls, which makes it hard to tell who is actually using the phone at any given time. Furthermore, agents have no toll records or other information that leads agents to believe that NEAL is using the prison phone system to communicate about his drug trafficking business. NEAL also has a cellphone that he can use frequently within the jail without having to

50

use the recorded. Thus, I do not believe that NEAL uses the jail phone system to talk about his drug trafficking, and that the risks of seeking those records far outweighs any expected benefit at this stage of the investigation.

90.    Law enforcement investigators have contacted law enforcement officials within the Georgia prison system, and they have been helpful by providing information from data taken from phones seized in the past within the prison system. This effort is in its infancy, and may yet yield important information about our investigation if information is obtained regarding the TARGET SUBJECTS and other unknown members of the DTO. Yet because any of this potential information is going to be old information, I believe it will yield little actionable information that can lead to seizures of narcotics or proceeds, and will not provide evidence sufficient to fully identify the users of the seized phones, tie them to specific seized narcotics, fully reveal their suppliers, or their distribution networks. Thus, while I believe that working with Georgia state prison system law enforcement side may yet yield important information that can potentially advance the investigation, I believe that this effort will fall far short of fully accomplishing the goals of this investigation, which I believe requires the real-time interception of communications by members of the DTO.

**MINIMIZATION**

91.    All communications intercepted over the TARGET TELEPHONES will first be listened to, read, and minimized at the TBI office in Chattanooga, in the EDTN. The requirements regarding the minimization of interception will be strictly followed. Before initial interception begins, a meeting will be held for all monitoring agents and civilian contract personnel wherein the requirements of minimization will be discussed. Any monitoring agents and civilian contract personnel not in attendance will be instructed on the requirements of minimization at a later time

51

prior to their involvement in any monitoring activity. A memorandum regarding minimization will be provided to all monitoring agents/contract personnel as well as a copy of the Order authorizing interception. A copy of that Order and a minimization memorandum will remain posted at the listening site. Before agents/contract personnel begin to intercept communications, the agents/contract personnel will be required to sign a form indicating that the agents/contract personnel have read this Affidavit, the Order authorizing interception, and the minimization memorandum and that the agent/contract personnel are familiar with the contents of the Order and will intercept wire and electronic communications in compliance with that Order. Special attention will be paid to minimizing privileged communications, including privilege marital communications, if applicable.

92. All monitoring of wire and electronic communications will be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature. If the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters. Special attention shall be given to minimize all privileged communications.

93. In the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period,

minimization may be accomplished as soon as practicable after such interception. In the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the Government, will be under the direct supervision of a federal agent.

94.     Based on my experience and that of other agents who have monitored and supervised wire interceptions, I believe that many drug related conversations may be part of an otherwise innocent conversation. Thus, lengthy conversations that appear to be non-pertinent will be periodically monitored to determine if the conversation has become criminal in nature.

95.     Electronic communications over the TARGET TELEPHONES will be intercepted. All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code. Each electronic communication (i.e. text message) will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "minimized" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" and may be shared with the other agents and monitors involved in the investigation. If a text message is marked "minimized" or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's Order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time

53

intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

96.    Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to HSI and TBI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through HSI and TBI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, HSI and TBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls from being intercepted in the packet data stream by filtering them out of the packet data stream before they are recorded. Those voice calls in the packet data stream will not be "intercepted" within the meaning of 18 U.S.C. § 2510(4) (defining "intercept" as the "aural or other acquisition" of the contents of a communications) (emphasis added). However, on rare occasions, a voice call might not be filtered out of the packet data stream due to circumstances including unanticipated technology changes by the service provider or imperfect operation of the filter program. If a voice call is not filtered out and is recorded in HSI and TBI's electronic communications collection system, the call will not be monitored or otherwise accessed through the electronic communications

presentation system, and HSI and TBI will preserve and seal such communications in the same manner as other intercepted electronic communications.

97.     As officers, deputies, investigators, and agents from state and local agencies may participate in this investigation, and their further participation would aid this investigation, it is requested that they be authorized to assist the agents in conducting this electronic surveillance, as provided by 18 U.S.C. §§ 2517(1) and 2517(2).  In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

98.     All intercepted wire and electronic communications will be recorded and all recordings will be securely preserved.  Computerized logs will be prepared regarding the date, time of calls/communications, the parties involved, the subject of the calls, and if and when minimization occurred. A report detailing the course of the interception will be filed with the Court on or about the fifteenth (15th) day following the commencement of interception, pursuant to the Order. Particular emphasis will be placed on reporting minimization efforts as well as the need for the wire and electronic intercepts to the Court.

99.     Finally, IT IS FURTHER REQUESTED that this Affidavit, the attached Application, the

resulting Order and Orders to the Service Provider, and all reports submitted pursuant to this Order

be sealed until further Order of the Court.

John Witsell
Special Agent, HSI

Subscribed and sworn to before me on this February ___25___, 2020.

HON. PAMELA L. REEVES
Chief United States District Judge
Eastern District of Tennessee